IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



NOV 2 6 2018

Clerk, U S District Court
District Of Montana
Billings

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DIMARZIO SWADE SANCHEZ,<br><br>Defendant. | CR 16-82-BLG-SPW-1<br><br>OPINION AND ORDER |

Defendant Dimarzio Swade Sanchez was convicted of First Degree Murder for the death of R.R., who was found strangled and burned in a field within the exterior boundaries of the Crow Indian Reservation. Sanchez has moved for a new trial based on newly discovered evidence, *Brady v. Maryland*, 373 U.S. 83 (1963), and *Arizona v. Youngblood*, 488 U.S. 51 (1988). After reviewing the trial transcript (cited as "Tr."), hearing transcript on the motion for a new trial (cited as "Mot."), and the exhibits, the Court denies the motion.

## I. Background

### A. Murder of R.R.

The day R.R. was murdered, in mid-April 2016, Dimarzio Sanchez, Frank Sanchez, Larry Sanchez, Angelica 'Jelly' Whiteman, Sarah Firebear, and Judaya Threefingers had been drinking and driving around. (Tr. 70:23-77:2 Judaya;

121:14-122:6 Sarah; 336:8-338:2 Angelica; 434:18-438:9 Frank). The group was drinking heavily enough that they ran out of alcohol by nightfall and decided to go to Kirby's Saloon to get some more. (Tr. 77:15-78:17 Judaya; 122:7-11 Sarah; 340:14-17 Angelica; 438:16-24 Frank). When they arrived at Kirby's Saloon, Dimarzio and Angelica went inside to gamble and buy alcohol; Frank went inside to use the restroom; and Larry, Sarah, and Judaya waited outside with the car. (Tr. 78:19-24 Judaya; 122:7-123:18 Sarah; 340:18-341:4 Angelica; 438:24-439:3 Frank). A few minutes later, Dimarzio and Frank emerged from Kirby's Saloon and joined the group waiting with the car. (Tr. 123:10-18 Sarah; 341:1-9 Angelica; 439:2-20 Frank). Shortly after, Angelica came back to the car with more alcohol and accompanied by R.R. (Tr. 78:18-81:7 Judaya; 123:23-124:11 Sarah; 341:9-345:19 Angelica; 440:1-16 Frank). Angelica told the group that she met R.R. inside, R.R.'s boyfriend had been beating her up, and R.R. needed a ride to Crow. (Tr. 78:19-81:10 Judaya; 123:23-124:14 Sarah; 341:9-345:16 Angelica; 440:1-25 Frank). No one in the group had met R.R. before. (Tr. 80:25-81:3 Judaya; 123:20-124:2 Sarah; 341:12-14 Angelica; 440:9-12 Frank).

Dimarzio agreed to give R.R. a ride home and the entire group piled into the car. (Tr. 78:19-81:23 Judaya; 124:23-125:25 Sarah; 345:17-24 Angelica; 440:16-441:15 Frank). At some point, the group stopped at Dimarzio's grandmother's house so Angelica, Judaya, and R.R. could use the restroom. (Tr. 81:22-82:16

Judaya; 125:13-129:2 Sarah; 345:25-346:21 Angelica; 441:19-443:9 Frank).

While the group was stopped at the grandmother's house, Dimarzio and Larry got into a fight. (Tr. 82:12-14 Judaya; 129:3-130:14 Sarah; 346:16-347:12 Angelica; 443:10-444:17 Frank). Due to the fight, Larry stayed at the grandmother's house and the rest of the group got into the car and headed toward Crow to drop off R.R. (Tr. 82:15-83:1 Judaya; 130:7-131:9 Sarah; 347:7-16 Angelica; 444:18-24 Frank). Along the way, a fight erupted between Angelica and R.R. over the mention of the name "Rocco," who is the father of Angelica's child and a friend of R.R.'s. (Tr. 83:3-84:9 Judaya; 261:2-22 Sarah; 347:19-349:13 Angelica; 444:21-446:7 Frank). Angelica and R.R. pulled each other's hair and exchanged blows. Either at Angelica's direction or Dimarzio's decision, or a combination of both, Dimarzio turned off the highway down a dirt road known as Castle Rock Road. (Tr. 83:8-84:16 Judaya; 261:4-264:5 Sarah; 348:8-350:5 Angelica; 446:8-446:20 Frank).

Dimarzio stopped the car a little ways down the road and the entire group got out. (Tr. 85:5-9 Judaya; 263:23-264:23 Sarah; 349:14-350:5 Angelica; 446:9-446:22 Frank). Once out of the car, Angelica and R.R. continued to fight. (Tr. 85:5-25 Judaya; 264:11-25 Sarah; 350:11-351:14 Angelica; 446:14-447:22 Frank). At some point, Dimarzio and Angelica either ordered R.R. to take her clothes off or they ripped them off her. (Tr. 86:1-22 Judaya; 350:11-351:21 Angelica).

Dimarzio and Frank told Judaya and Sarah to get back inside the car, which they did. (Tr. 86:23-87:5 Judaya; 264:24-265:11 Sarah).

Dimarzio pulled out a bandana, told Angelica "I'm only going to show you this once and one time only," or "this is how you do it," crossed the bandana around R.R.'s neck, and began choking her. (Tr. 267:17-24, 269:1-11 Sarah; 355:9-358:7 Angelica; 451:13-452:20 Frank). Dimarzio gave the bandana to Angelica, told her she had to finish it off, and he and Frank got back in the car. (Tr. 355:9-358:7 Angelica; 451:14-452:23 Frank). Angelica wrapped the bandana around R.R.'s neck and choked her until R.R. defecated and went limp. (Tr. 87:25-88:8 Judaya; 269:1-11 Sarah; 356:22-357:10 Angelica; 453:2-453:18 Frank). Angelica came back to the car, crying, saying she'd killed R.R. (Tr. 82:25-88:3 Judaya; 269:1-6 Sarah; 356:23-358:22 Angelica; 453:2-453:18 Frank). Dimarzio and Frank exited the car to check if R.R. was dead, and discovering she was only unconscious, came back to the car and told Angelica, "you only blacked her out." (Tr. 88:1-12 Judaya; 269:1-9 Sarah; 358:17-18 Angelica). Dimarzio popped the trunk and told Frank to get the gas can. (Tr. 369:20-24 Sarah; 358:8-359:4 Angelica; 453:21-454:19 Frank).

Frank grabbed the gas can out of the trunk and handed it to Dimarzio. (Tr. 358:25-359:4 Angelica; 454:14-19 Frank). Dimarzio drenched R.R. in gasoline and lit her on fire. (Tr. 359:5-10 Angelica). When Dimarzio poured the gasoline

over R.R., either Angelica or Frank, or both, were outside with him. (Tr. 88:13-89:13 Judaya; 270:21-271:25 Sarah; 359:5-359:17 Angelica; 455:4-455:19 Frank). Dimarzio and either Angelica or Frank, or all three, came running back to the car, got in, and told Judaya and Sarah not to look back. (Tr. 88:17-89:4 Judaya; 270:21-271:11 Sarah). Both Judaya and Sarah looked back anyway, and saw a fire burning where R.R. was laying. (Tr. 89:3-89:13 Judaya; 271:1-11 Sarah). The group drove off, leaving R.R. to die. (Tr. 89:14-92:11 Judaya; 271:20-277:25 Sarah; 359:12-364:25 Angelica; 456:5-457:24 Frank).

By chance, several hours later, a rancher stopped off on Castle Rock Road to relieve himself. (Tr. 53:5-54:21). He saw R.R. laying along the road, completely naked in the freezing cold and covered in burns, but miraculously alive. (Tr. 54:22-55:16). After putting a blanket around her and giving her something to drink, the rancher contacted law enforcement for help. (Tr. 55:12-56:1). R.R. was rushed to the emergency room at the Crow hospital where doctors tried to stabilize her. (Tr. 406:21-415:18). She was then life-flighted to the burn unit at the University of Utah. (Tr. 415:11-20). Her condition was critical when she arrived at the Utah burn unit, with severe burns over 40% of her body, including her face, her chest, her back, her arms, and her legs. (Tr. 416:24-417:22). After doctors performed more than twenty life-saving procedures, R.R. died due to complications from her burns. (Tr. 420:4-14, 422:25-423:21; 430:21-25).

**B.      Criminal proceedings against Dimarzio, Angelica, and Frank**

On June 20, 2016, a criminal complaint was sworn and arrest warrants were issued for Dimarzio and Angelica. (Doc. 1). On June 22, 2016, Dimarzio and Angelica were arrested. On July 22, 2016, Dimarzio, Angelica, and Frank were indicted for first degree murder and/or aiding abetting first degree murder for the death of R.R. (Doc. 16). Frank was arrested later that day. On March 6, 2017, Frank entered into a plea agreement with the United States, in which he agreed to plead guilty to the superseding information charging him with accessory after the fact and misprision of a felony in exchange for the United States dismissing the indictment against him. (Docs. 111, 112, 114, 116, and 117). On August 8, 2017, Angelica entered into a plea agreement with the United States, in which she agreed to plead guilty to the indictment in exchange for the United States recommending a three level reduction of her offense level under the United States Sentencing Guidelines. (Docs. 159, 160, and 165).

On December 4, 2017, Dimarzio's jury trial began. (Doc. 249). On December 7, 2017, after a two hour deliberation, the jury returned a guilty verdict against Dimarzio for first degree murder. (Docs. 258 and 259).

**C.      Post-trial information**

On December 8, 2017, the day after Dimarzio's trial ended, Ananda Littlebird brought a phone to the Bureau of Indian Affairs office. (Mot. 80:3-82:3;

71:21-72:5; 54:12-56:5). Ananda showed BIA Agent Chansey McMillin a typed

note on the phone, which was saved in the phone's calendar under the date "April

16, 2016," and set to reoccur yearly. (Mot. 80:3-82:3; 10:8-14:6; Doc. 307-1; Doc.

324-1). The note stated verbatim:

> I should have told them the truth about what I did.. Now I'm full of
> regret not of what happen but I told them what somewhat happen I
> was apart of it.. I beat her in the car a bit I kicked her on the side of
> the head I helped find the gas can. I felt so alone when I found out
> they got caught

(Mot. 12:12-20; Doc. 307-1). Agent McMillin did not immediately

appreciate the relevance of the note because he was not involved in the

investigation or case involving R.R.'s murder. (Mot. 78:25-87:14).

However, the note seemed peculiar to him so he took a screenshot of the

note and told Ananda she should not delete it until he could figure out if it

was important. (Mot. 80:8-19). A couple of days later, on December 11,

2017, Agent McMillin showed the screenshot of the note to BIA Agent John

Dodd. (Mot. 71:21-72:5). Agent Dodd, due to his involvement in the

investigation into R.R.'s death, saw the relevance of the note. (Mot. 71:5-

72:5). He and Agent McMillin attempted to make contact with Ananada at

her house, but were unsuccessful. (Mot. 76:5-11; 81:14-20).

Meanwhile, FBI Agent Aaron Christensen, who was involved in the

investigation into R.R.'s death, had also received information about the note.

On December 8, 2017, Agent Christensen received a text which contained a screenshot of a Facebook post of the note. (Mot. 33:20-35:1). The Facebook post was made by Ananda. (Mot. 21:17-23:6; 67:6-68:7). Agent Christensen immediately informed the prosecution about the Facebook post and note. (Mot. 35:5-18). A couple of days later, Agent Christensen and Agent Dodd made contact with each other and discussed recovering the phone from Ananda. (Mot. 55:14-23; 76:22-24).

On December 13, 2017, Agent Christensen recovered the phone and interviewed Ananda. (Mot. 56:24-57:1). Ananda informed Agent Christensen she purchased the phone second-hand from Shauntel Russell and had deleted the Facebook post of the screenshot of the note at her grandmother's instruction. (Mot. 35:21-36:17; 67:1-68:7). Agent Christensen interviewed Shauntel and learned that she also purchased the phone second-hand. (Mot. 36:18-37:8). At that point, Agent Christensen attempted to work backwards through the phone's chain of custody until he came across a person or date related to R.R.'s death. (Mot. 36:8-37:8). At around the same time, Agent Christensen submitted the phone for forensic analysis. (Mot. 56:24-57:25). Eventually, after interviewing multiple people throughout December and January, Agent Christensen reached what he thought was a dead end and turned over his reports and the forensic analysis to the prosecution. (Mot. 36:8-40:10; 60:1-20; Doc. 345 Ex. 1). Agent Christensen

believed at least seven different people owned the phone in 2017 and an unknown number prior to that. (Mot. 61:12-19).

On January 22, 2018, Laura Lonebear contacted defense counsel and told them about the note. (Doc. 303-1 at 1-3). Upon receiving this information, defense counsel contacted the prosecution and asked if the FBI had the phone. (Doc. 303-2). The prosecution responded the FBI had the phone and was currently investigating the matter. (Doc. 303-2). Shortly after, defense counsel requested discovery related to the phone. (Doc. 308 at 1-2). On February 1, 2018, the prosecution provided the defense with an email summary of the FBI's investigation into the phone, but did not turn over Agent Christensen's reports, the forensic analysis, or the phone itself until March 9, 2018. (Doc. 345 Ex. 1; 307 at 3; Mot. 59:22-61:7). Defense counsel had the phone forensically analyzed by its own expert. (Mot. 6:18-9:21).

The forensic analysis performed by the defense and prosecution revealed additional information about the phone. The note was typed under what's known as a calendar event. (Mot. 10:8-20:8; 89:17-96:15). A calendar event is something a person creates in the phone's calendar to remind the person of an important date or time, such as someone's birthday or tax day. (Mot. 10:8-20:8; 89:17-96:15). Within a calendar event, a person can type a note describing details about the calendar event. (Mot. 10:8-20:8; 89:17-96:15).

The April 16, 2016, calendar event, under which the note was saved, was created on June 22, 2016. (Mot. 10:8-20:8; 89:17-96:15). The event was titled "[R.R]." (Mot. 13:10-15). The April 16, 2016, calendar event was never deleted and remained on the phone. (Mot. 55:1-6). The phone also contained a July 4, 2016, calendar event, which was created on June 24, 2016. (Mot. 10:8-20:8; 89:17-96:15). The July 4, 2016, calendar event was titled "Theron's daughter birthday," and contained a note, which read verbatim, "Found out her second birthday. It is because Josie Hart messaged me asking to tell him if he would be able to make it. Then Theron got mad at me because he thought I was talking shit to her when all I was doing was sending the message like that saying a little bird told me." (Mot. 14:11-15:7). Both the April 16, 2016, and the July 4, 2016, calendar events were modified on December 15, 2016. (Mot. 10:8-20:8; 89:17-96:15). A modification means something was either added or deleted from the calendar entry. (Mot. 15:18-21). Because the calendar entries were modified on December 15, 2016, there is no way of definitively knowing what the notes said when the calendar entries were created. (Mot. 10:8-20:8; 89:17-96:15).

Due to the information gleaned from the forensic analyses, Agent Christensen and the defense team's investigator separately interviewed Josie Hart. (Mot. 24:1-5; 48:15-50:3). Josie used to date Theron Adams and the two have one child together, whose birthday is July 5th. (Mot. 24:6-17). On June 24, 2016,

Josie messaged Judaya, via either Facebook or text, to inquire about Josie and

Theron's daughter's birthday party. (Mot. 25:1-17). Josie messaged Judaya

because Theron had blocked Josie from contacting him, and Josie knew Judaya and

Theron were dating at the time. (Mot. 24:20-25:17).

Agent Christensen also interviewed Judaya. Judaya denied owning the

phone in question but acknowledged she goes through a lot of phones. (Mot.

53:17-25). Judaya admitted she messaged back and forth with Josie on June 24,

2016. (Mot. 53:1-4). After some prodding from Agent Christensen, Judaya stated

she may have written the note in the phone's July 4, 2016, calendar event

regarding Josie's daughter's birthday. (Mot. 53:5-8). But she denied writing the

note in the phone's April 16, 2016, calendar event, and stated the note's

description of the author's involvement in R.R.'s murder was false as applied to

her. (Mot. 52:1-15).

## II.    Discussion

Dimarzio's position is Judaya wrote the note saved under the April 16

calendar entry, which he contends makes it powerful impeachment evidence

against her because it's inconsistent with her and the other eyewitness accounts of

her role. Based on the note, Dimarzio argues he should get a new trial for three

reasons. First, Dimarzio argues the government withheld the phone evidence in

violation of *Brady*. Second, Dimarzio argues the phone evidence is newly

discovered evidence which, if heard by the jury, would make it more likely than not he would be acquitted of R.R.'s murder. And third, Dimarzio argues the government destroyed the phone evidence.

Dimarzio also argues his expert witness was possibly under the influence of drugs when she testified and his trial was prejudiced as a result.

## A.    *Brady* violation

Dimarzio argues he should be given a new trial because the government violated *Brady* when it did not disclose the phone evidence for three months.

*Brady* and its progeny obligate the government to turn over evidence in its possession that is both favorable to the accused and material to either guilt or punishment. *Kyles v. Whitley*, 514 U.S. 419, 432 (1995). A defendant's right to *Brady* material, as it has come to be known, derives from the Constitution's basic "fair trial" guarantee found in the Fifth, Sixth, and Fourteenth Amendments. *United States v. Ruiz*, 536 U.S. 622, 628 (2002). But the right *Brady* recognizes is primarily a pre-trial one; the government's obligation ends once a defendant has been fairly and validly convicted. *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68-69 (2009). The Ninth Circuit construes *Osborne* to mean the government's *Brady* obligation exists until the conviction is confirmed on direct appeal. *Runningeagle v. Ryan*, 686 F.3d 758, 772 n. 6 (9th Cir. 2012). At least one district court, in a pre-*Osborne* decision, held the government's *Brady*

obligation exists through the three-year limitation period for filing a motion for a new trial, even if the conviction has been confirmed on direct appeal. *United States v. Johnson*, 557 Supp.2d 1066, 1071 (N.D. Cal. 2008).

Here, under *Runningeagle*, Dimarzio had and still has a right to *Brady* material because his conviction has not been confirmed on direct appeal.

A *Brady* violation has three components: (1) the evidence at issue must be favorable to the accused because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the government either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).

### 1.   Whether the evidence is exculpatory or impeaching

First, the evidence is not exculpatory because it incriminates the author in aiding the murder of R.R., rather than exonerating Dimarzio. The substance of the note, that the author hit R.R. and helped find the gas can, does not conflict with the four eye witness accounts, and the jury's determination, of Dimarzio's role in R.R.'s murder. But the evidence is potentially impeaching, and the Court disagrees with the government that Dimarzio would not have been able to introduce the note in an attempt to impeach Judaya.

When the relevance of evidence depends on whether a fact exists, a party is allowed to introduce proof to support a finding that the fact does exist. Fed. R.

Evid. 104(b).  The advisory committee notes to Rule 104(b) contemplate a situation similar to here, where a party attempts to introduce a letter allegedly written by a witness to establish an admission by him.  In that situation, the Court is advised to make a preliminary determination whether there is evidence sufficient to support a finding that the witness wrote the letter.  If there is, the issue is submitted to the jury to decide.  In addition to Rule 104(b), Rule 613(b) allows a party to prove a witness made a prior inconsistent statement with extrinsic evidence, so long as the witness is given the opportunity to explain or deny making the prior inconsistent statement.  *United States v. Chavez*, 979 F.2d 1350, 1355 (9th Cir. 1992) (requiring party to offer proof that witness made the statement before attempting to impeach him with it); *Carnell Const. Corp. v. Danville Redevelopment & Housing Authority*, 745 F.3d 703, 719 (4th Cir. 2014) ("For a statement to qualify as a witness' prior inconsistent statement . . . [it] must be one that the witness has made or adopted.") (citing Fed. R. Evid. 613).  Finally, the Sixth Amendment's Confrontation Clause affords criminal defendants expansive cross-examination of witnesses.  *United States v. Kohring*, 637 F.3d 895, 905 (9th Cir. 2011).  Jurors are entitled to have the defense theory before them so they can make an informed judgment about the weight to give the testimony of the government witnesses.  *Kohring*, 637 F.3d at 905.  Three factors determine whether a criminal defendant's right to effective cross-examination is violated: (1)

whether the excluded evidence was relevant; (2) whether there were other legitimate interests outweighing the defendant's interest in presenting the evidence; and (3) whether the exclusion of the evidence left the jury with sufficient information to assess the credibility of the witness. *Kohring*, 637 F.3d at 905.

Here, Dimarzio makes a reasonable case that Judaya wrote the note. The note may have been written on June 22, 2016, the same day Dimarzio and Angelica were arrested. The note incriminates the author in R.R.'s murder and indicates the author felt remorse when "they" got caught and the author didn't. Notably, Judaya was never charged with a crime in connection to R.R.'s murder. The phone contained another note regarding Theron's daughter's birthday party, which may have been written on June 24, 2016. Judaya was dating Theron at the time and admitted she had been messaging with Theron's daughter's mother on June 24, 2016, about the birthday party. Judaya also admitted she may have written the note about Theron's daughter's birthday party.

On the other hand, plenty of doubt exists that Judaya wrote the notes, too. Both experts stated it was impossible to know for certain what the notes said on June 22, 2016, and June 24, 2016, respectively, because the calendar entries under which the notes were saved had been modified on December 15, 2016. And the phone was owned by at least seven different people in 2017 alone, and an unknown number before that.

Balancing these facts, and considering Rule 104(b), Rule 613(b), and the Confrontation Clause, the Court holds Dimarzio would have at least satisfied his burden to provide some foundational proof that Judaya wrote the note and submit the issue to the jury. The note therefore is impeachment evidence subject to *Brady* disclosure requirements.

### 2. Whether the government suppressed the phone evidence

The defendant bears the burden of producing some evidence to support an inference that the government possessed the evidence and failed to disclose it. *United States v. Price*, 566 F.3d 900, 910 (9th Cir. 2009). Once the defendant produces such evidence, the burden shifts to the government to demonstrate it satisfied its duty to disclose all favorable evidence known to it and others acting on the government's behalf. *Price*, 566 F.3d at 910. To comply with *Brady*, disclosures must be made at a time when disclosure would be of value to the accused. *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988).

Normally, the issue is whether the lateness of the disclosure so prejudiced the defendant's preparation of his defense that it amounted to an unfair trial. *United States v. Miller*, 529 F.2d 1125, 1128 (9th Cir. 1976). The distinction to be made here is neither the government nor its agents learned of the phone evidence until after trial. Although the government's *Brady* obligation continues until the conviction in confirmed on appeal, it makes little sense to analyze the timeliness

question in the usual *Brady* pre-trial context when the government did not possess the evidence until after trial. Instead, in situations where the evidence is discovered after the defendant's conviction but before the conviction is confirmed on appeal, the timeliness question should be framed as whether the late disclosure prejudiced whatever post-trial or pre-appeal remedies were or are available to the defendant.

A defendant's primary post-trial remedy is a motion for a new trial, which must be filed either within fourteen days if it is based on grounds other than newly discovered evidence, or, if it is based on newly discovered evidence, within three years. Fed. R. Crim. P. 33(a-b). Here, the government's disclosure more than satisfied *Brady*'s timeliness requirement. Dimarzio initially filed a motion for a new trial based on grounds other than newly discovered evidence within the fourteen day time limit. (Doc. 272). Upon request and the government's agreement, the time period for Dimarzio to brief and investigate his motion for a new trial was extended. (Docs. 272, 273, 274, 276). It was during this extended time period the government informed Dimarzio it had come into possession of the phone and was currently investigating its origin. Due to this information, Dimarzio filed a second motion for a new trial, this time based on newly discovered evidence. (Doc. 302). The government then provided a summary of its investigation, followed by its agents' notes, interviews, forensic analysis, and the

phone itself. Dimarzio obtained his own forensic analysis of the phone and his investigator interviewed people connected with the phone. Dimarzio included this information in his reply brief for his second motion for a new trial. (Doc. 324). The Court held a hearing, and heard all the available phone evidence possessed by both Dimarzio and the government and its agents. (Doc. 345). The Court permitted post-hearing briefing upon Dimarzio's request. (Mot. 97:1-98:10). The government therefore satisfied *Brady*'s timeliness requirement because it disclosed the phone evidence in time for Dimarzio to use it in his motion for a new trial. *Gordon*, 844 F.2d at 1403.

### 3.    Whether prejudice resulted

A finding that the government timely disclosed the phone evidence negates any argument prejudice ensued. Dimarzio cannot suffer prejudice due to the government withholding favorable evidence if the government did not withhold the evidence. But it bears mentioning Dimarzio is mistaken as to the remedy he would be entitled to even if the government had suppressed the evidence and prejudice resulted.

*Brady*'s purpose is to ensure defendants receive fair trials. *Ruiz*, 536 U.S. at 628. Thus, when a government violates *Brady* and deprives a defendant of a fair trial, the remedy is to rectify the unfair trial by giving the defendant a new trial. *Kohring*, 637 F.3d at 912. But in the post-trial context, *Brady*'s purpose is to

ensure defendants receive fair process in seeking post-trial remedies. If a government violated *Brady* in the post-trial context and deprived a defendant of fair process in litigating, for instance, a motion for a new trial, the logical remedy would be to allow the defendant to file another motion for a new trial. *See Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997). But that process is precisely what Dimarzio has already received. He has filed and litigated a motion for a new trial armed with all the evidence he and the government and its agents possess, including the phone evidence discovered after trial. In essence, even if the government had suppressed the evidence, and even if the Court found prejudice resulted from the suppression, he has already been given the remedy due him.

Dimarzio is therefore not entitled to a new trial under *Brady*, because the government did not withhold evidence and no prejudice resulted.

## B. New trial based on newly discovered evidence

Dimarzio argues he should be given a new trial under Rule 33 because the phone evidence makes it more likely than not that an acquittal would result on retrial.

Upon the defendant's motion, the district court may vacate the judgment and grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33(a). The interests of justice include newly discovered evidence. *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005). To prevail on a Rule 33 motion

based on newly discovered evidence, a defendant must satisfy a five-part test: (1) the evidence must be newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal. *Harrington*, 410 F.3d at 601.

The government concedes the first two parts of the test but argues the evidence is immaterial, it is cumulative or merely impeaching, and a new trial would not probably result in acquittal. As explained under its *Brady* impeachment analysis, the Court disagrees the evidence is immaterial. It is potentially powerful impeachment evidence of one of four eye witnesses to the crime and is admissible under Rule 104(b), Rule 613(b), and the Confrontation Clause.

The Court agrees, however, that the evidence is insufficient to support a Rule 33 motion because it is "merely" impeaching. Generally, impeachment evidence cannot serve as the sole basis for a new trial. *United States v. Hinkson*, 585 F.3d 1247, 1266 (9th Cir. 2009). There are certain recognized situations, though, where impeachment evidence goes beyond "mere" impeachment. Impeachment evidence that has a strong exculpatory connection to the charge against the defendant, or that totally undermines critical evidence, can serve as the basis for a new trial. *United States v. Quiles*, 618 F.3d 383, 395 (3rd Cir. 2010).

But impeachment evidence which lacks this pedigree—"evidence that is 'merely' impeaching without an exculpatory connection with respect to the charge against the defendant or without undermining critical inculpatory evidence"—will not suffice. *Quiles*, 618 F.3d at 395.

Here, the impeachment evidence, while potentially potent (assuming the jury believed Judaya wrote it), falls short. The impeachment evidence has no exculpatory connection and does not undermine critical evidence because Dimarzio's conviction does not hinge on Judaya's credibility. The case against Dimarzio was made by four eyewitnesses, and Judaya's testimony was the least damning of the group. She did not testify about what occurred outside of the car, other than Angelica fighting with R.R. She did not testify about who grabbed the gas can, who poured the gas, or who lit the fire. The most she said about Dimarzio was he was outside of the car with Angelica and Frank when the fire was lit. Discrediting Judaya would've put only a slight dent in the government's case against Dimarzio, meaning the evidence is insufficient to overcome *Harrington*'s fourth prong because it is "merely" impeaching. *Hinkson*, 585 F.3d at 1266; *Quiles*, 618 F.3d at 395.

Because the phone evidence is "merely" impeaching, analysis of *Harrington's* final step is probably unnecessary. Nonetheless, in an abundance of caution, in case the Court is incorrect that the phone evidence is more than merely

impeaching, Dimarzio still fails to overcome the final hurdle of his new trial motion: that it is more likely than not a retrial would result in acquittal.

To begin, due to conflicting evidence, it's far from certain the jury would find Judaya wrote the note. It's just as likely the jury would find Judaya did not write the note, in which case there would be no argument a retrial would probably result in acquittal. Next, even if the jury found Judaya wrote the note and discredited her testimony entirely, the remaining evidence substantially incriminates Dimarzio.

After R.R. had been beaten to the ground, Angelica, Sarah, and Frank testified Dimarzio grabbed a bandana and told Angelica "I'm only going to show you this once and one time only," or "this is how you do it." Angelica and Frank testified Dimarzio choked R.R with the bandana. Angelica and Frank testified Dimarzio gave Angelica the bandana and told her to finish it off. Sarah testified when Angelica came back to the car stating she'd killed R.R., Dimarzio exited the car and said "you only blacked her out." Sarah, Angelica, and Frank testified Dimarzio popped the trunk. Angelica and Frank testified Frank grabbed the gas can from the trunk and handed it to Dimarzio. Angelica testified Dimarzio poured the gas on R.R. Angelica, Sarah, and Frank testified Dimarzio was outside the car when R.R. was doused in gasoline and lit on fire. If the jury heard this evidence again, it is not more likely than not a retrial would result in acquittal.

Dimarzio points out inconsistencies in the eyewitness testimony. The most glaring inconsistency is that Angelica claimed she was in the vehicle and Frank was outside the vehicle when R.R. was drenched in gasoline, whereas Frank claimed he was in the vehicle and Angelica was outside the vehicle when the gas was poured. Both Angelica and Frank also claimed Judaya was in the car when the gas was poured. Dimarzio argues they can't all be telling the truth, and by discrediting Judaya's story, he discredits Angelica and Frank, too. What Dimarzio fails to explain is how the note exploits those inconsistencies and exonerates him. The note is consistent with the government's theory that Dimarzio soaked R.R. in gasoline and lit her on fire. The author of the note admits helping to find the gas can, not pouring the gas or lighting the fire. Even if on retrial the jury believed Judaya's role in R.R.'s murder was larger than any of the eyewitnesses remembered or portrayed, it does not logically follow that it would likely find Dimarzio less culpable.

Dimarzio is therefore not entitled to a new trial under Rule 33's newly discovered evidence standard, because the evidence is merely impeaching and a new trial would not probably result in acquittal.

## C.    Destruction of evidence

Dimarzio argues the government destroyed evidence when it allegedly directed Ananda to delete the calendar entry and delete the Facebook post.

To obtain relief for the government's destruction of evidence, a defendant must show (1) evidence was lost or destroyed; (2) the evidence was potentially exculpatory; (3) the destruction was done in bad faith; and (4) the defendant has no alternative means of proving his point. *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013) (citing *Youngblood*, 488 U.S. at 56-57).

Dimarzio's destruction of evidence claim fails with regard to the note because the government did not destroy or lose any evidence. Although Ananda claimed in an affidavit that she was instructed by a BIA agent to delete the note, the evidence shows she was clearly mistaken. Neither the phone nor the note were lost or destroyed. Both the government and Dimarzio have forensically analyzed the phone and harvested all the available information from it.

Dimarzio's destruction of evidence claim also fails with regard to the Facebook post because the government did not lose or destroy it and the Facebook post was not potentially exculpatory. Ananda deleted the Facebook post before she went to the BIA at the instruction of her grandmother. The government never possessed the Facebook post, nor could it, given the Facebook post existed on a digital social media platform connected to a private individual's account. Finally, the Facebook post's exculpatory value is nil. The Facebook post was a screenshot of the note, which in no way tends to exonerate Dimarzio, particularly when he possessed and forensically analyzed the actual phone containing the note. *Sivilla*,

714 F.3d at 1172 ("For evidence to be materially exculpatory, its exculpatory nature must be apparent.").

## D. Dimarzio's expert witness

After his trial, Dimarzio apparently learned that his expert witness was under indictment in South Dakota on four counts of fraudulently obtaining a controlled substance. (Doc. 273 at 2-3; Doc. 275-1). Dimarzio asserts his expert witness never disclosed this fact to him, his trial was prejudiced as a result, and he should be given a new trial. Somewhat inconsistently, Dimarzio also asserts he is satisfied with his expert's clinical approach and findings. (Doc. 303 at 5).

Upon the defendant's motion, the district court may vacate the judgment and grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33(a). The interests of justice may include, among many other reasons, prosecutorial misconduct, overindictment, absence of defense witnesses at trial, evidentiary errors, improper jury instructions, juror misconduct, ineffective assistance of counsel, or newly discovered evidence. *See, e.g.*, *United States v. Bowen*, 799 F.3d 336 (5th Cir. 2015); *United States v. Polouizzi*, 687 F.Supp.2d 133 (E.D.N.Y. 2010); *United States v. Scroggins*, 379 F.3d 233 (5th Cir. 2004); *United States v. Tory*, 52 F.3d 207 (9th Cir. 1995); *United States v. Moore*, 763 F.3d 900 (7th Cir. 2014); *United States v. Harber*, 53 F.3d 236 (9th Cir. 1995), *United States v.*

*Theodore*, 468 F.3d 52 (1st Cir. 2006); *United States v. Piazza*, 647 F.3d 559 (5th Cir. 2011).

Despite the numerous other categories his expert's indictment may fall into, it appears Dimarzio argues his expert's indictment is newly discovered evidence. (Doc. 273 at 3-8). To prevail on a Rule 33 motion based on newly discovered evidence, a defendant must satisfy a five-part test: (1) the evidence must be newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal. *Harrington*, 410 F.3d at 601.

Dimarzio fails to satisfy the final four parts of the *Harrington* test with regard to his expert's indictment. Dimarzio submitted no evidence that he diligently vetted his expert before or after hiring her. Dimarzio fails to explain how his expert's indictment is material to whether he murdered R.R. Dimarzio fails to explain why his expert's indictment is not merely impeachment evidence, and further fails to explain how impeaching his own expert would enhance his case. Finally, Dimarzio fails to identify, much less analyze, how or why it is more likely than not the jury would acquit him of R.R.'s murder once it learned his

expert was indicted on drug charges. Dimarzio's motion is denied with regards to his expert's indictment.

## IV.  Conclusion

For the foregoing reasons, Dimarzio's motion for a new trial (Doc. 302) is DENIED.

DATED this 26th day of November, 2018.

SUSAN P. WATTERS
United States District Judge