IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>vs.<br><br>DIMARZIO SWADE SANCHEZ,<br><br>Defendant/Movant. | Cause No. CR 16-082-BLG-SPW<br>CV 21-116-BLG-SPW<br><br><br>ORDER DENYING § 2255 MOTION<br>AND DENYING CERTIFICATE<br>OF APPEALABILITY |

Defendant Dimarzio Swade Sanchez, a federal prisoner proceeding *pro se*, moves to vacate or set aside his sentence under 28 U.S.C. § 2255. On December 7, 2017, a jury found him guilty of aiding and abetting the first-degree murder[1] of Roylynn Rides Horse. *See* Verdict (Doc. 260). He is serving the statutorily mandated term of life in prison. *See* Judgment (Doc. 382) at 2; 18 U.S.C. § 1111(a), (b).

## I. Preliminary Review

Before the United States is required to respond to the motion, the Court must determine whether "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule

---

[1] Sanchez refers to his prosecution as a "capital case." The offense was punishable by death, but the United States never sought the death penalty.

1

4(b), Rules Governing Section 2255 Proceedings for the United States District Courts. A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolas*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). But the Court should "eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases, *cited in* Advisory Committee Note (1976), Rule 4, Rules Governing § 2255 Proceedings.

## II. Background

On April 17, 2016, a rancher driving on Castle Rock Road on the Crow Indian Reservation spotted something he thought was a newborn calf lying on the road. When he went to investigate, he found it was actually a woman. She was naked, badly beaten, frostbitten, and very severely burned. She was so seriously hurt that the rancher did not dare move her to his truck. He retrieved a sleeping bag from the truck and covered her to keep her warm. She said she was thirsty, but her mouth was swollen shut. He was able to give her a drink of cola through a straw, and he contacted police. The woman, Roylynn Rides Horse, received emergency stabilization treatment at Crow Agency Hospital and was immediately transferred to the burn center at the University of Utah Hospital.

Patrons and surveillance video at a local bar indicated Rides Horse got into an argument with her boyfriend, Oliver Half, at the bar on Saturday evening, April 16. Sanchez was at the bar with his half-brother Frank, Angelica Jo Whiteman, and two juvenile girls, S.F. and J.T. The video showed Rides Horse and Whiteman began talking and went outside together.

Law enforcement agents from the Bureau of Indian Affairs ("BIA") interviewed Sanchez on April 20. Initially, he said he was home all night on April 16. When they asked whether he went to the bar, he denied it. Eventually, he changed his story and said he, Whiteman, and others went to the bar on April 16 and met Rides Horse. He claimed he and Whiteman dropped off Frank and the girls shortly after leaving the bar, took Rides Horse to a trailer house in Dunmore, and then left the car at another person's house. A search warrant for Sanchez's residence led to the discovery of a clump of hair and what appeared to be remnants of burnt clothing in a firepit. The hair was not Rides Horse's, and the remnants of clothing could not be identified as hers.

Based on statements from Frank, S.F., and J.T., Sanchez and Whiteman were arrested on a complaint on June 22, 2016, charged with assault with intent to commit murder and aiding and abetting the same. *See* Compl. Aff. (Doc. 1-1) at 3–5.[2] Chief Federal Defender Anthony Gallagher and Assistant Federal Defender

---

[2] Sanchez was not charged in tribal court. *See* Presentence Report ¶¶ 50–58.

3

Gillian Gosch were appointed to represent Sanchez. *See* Order (Doc. 9).

On June 28, 2016, Rides Horse died due to complications from her burns.

On July 22, 2016, a grand jury indicted Sanchez, Whiteman, and Frank Sanchez on one count of first-degree murder, a violation of 18 U.S.C. § 1111. The United States pled an aiding-and-abetting theory. *See* 18 U.S.C. § 2. Jurisdiction was predicated on the Major Crimes Act, 18 U.S.C. § 1153(a). *See* Indictment (Doc. 16) at 1–2.

Because the critical evidence consisted of participants' statements, Sanchez moved to sever his trial from the other co-defendants. His motion was granted. *See* Order (Doc. 80); *Gray v. Maryland*, 523 U.S. 185 (1998); *Bruton v. United States*, 391 U.S. 123 (1968). Sanchez filed other pretrial motions as well, including a motion to suppress statements he made to the BIA agents. After an evidentiary hearing, his suppression motion was denied. *See* Minutes (Doc. 102); Order (Doc. 104).

On March 14, 2017, Frank Sanchez pled guilty to misprision of a felony and being an accessory after the fact. *See* Superseding Information (Doc. 114); Minutes (Doc. 118). On August 30, 2017, Whiteman pled guilty to aiding and abetting first-degree murder. *See* Minutes (Doc. 173).

Trial commenced on December 4, 2017. Whiteman, Frank Sanchez, S.F., and J.T. all testified at trial. The jury found Sanchez guilty beyond reasonable

doubt of first-degree murder and aiding and abetting the same. *See* Verdict (Doc. 260).

Following the Court's denial of a motion for new trial, *see* Order (Doc. 354), Sanchez was sentenced to life in prison on December 21, 2018. *See* Minutes (Doc. 376); Judgment (Doc. 382).

Sanchez appealed. On March 16, 2020, the Ninth Circuit Court of Appeals affirmed his conviction. *See* Mem. Disp. (Doc. 407), *United States v. Sanchez*, No. 18-30255 (9th Cir. Mar. 16, 2020). On October 5, 2020, the United States Supreme Court denied his petition for writ of *certiorari*. *See* Clerk Letter (Doc. 419).

Sanchez filed his § 2255 motion on October 27, 2021. *See* Mot. § 2255 (Doc. 427) at 6 ¶ C; *Houston v. Lack*, 487 U.S. 266, 276 (1988). The motion is untimely by 22 days, *see Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012); 28 U.S.C. § 2255(f)(1), but it is more efficient to address the merits.

### III. Claims and Analysis

Sanchez brings four claims for relief. First, he asserts that the United States withheld material evidence in the form of a toxicology report that was part of the autopsy. Second, he claims that his suppression motion should have been granted. Third, he contends that the agents who interviewed him interfered with his right to counsel by permitting him to consult with a person who was not an attorney.

Finally, he claims that counsel were ineffective because they did not challenge the cause of Rides Horse's death; point out that he refused to make any statements as to who actually harmed the victim; or argue that the co-defendants changed their statements to suit the prosecution's preferred version of events.

Sanchez's claims are reorganized here, but all are addressed.

### A. Cause of Death

Sanchez asserts both a violation of the Due Process Clause, *see Brady v. Maryland*, 373 U.S. 83, 87 (1963); Mot. § 2255 (Doc. 427) at 3, 8–9, and a violation of his Sixth Amendment right to effective assistance of counsel, *see Strickland v. Washington*, 466 U.S. 668 (1984); Mot. § 2255 at 12, in connection with the cause of Rides Horse's death.

At trial, a treating physician testified to numerous attempts to graft skin over Rides Horse's burns and numerous medications to control pain and infection. *See, e.g.*, 3 Trial Tr. (Doc. 328) at 420:4–422:24. Despite these efforts, Rides Horse developed severe sepsis on June 26. After a final, unsuccessful attempt "to try and reexcise her wounds trying to get rid of anything that was infected and might be driving this process," a doctor spoke with Rides Horse's family, "and that resulted in a change of care," presumably meaning termination of life support. *See id.* at 423:4–21. Sanchez contends that these facts suggest the actual cause of death was not his actions but events that occurred in the hospital.

To support a *Brady* claim, Sanchez must allege facts sufficient to support an inference that the United States possessed, but did not disclose,[3] evidence that is exculpatory or tends to impeach a prosecution witness; and that disclosure of the evidence might have led to an acquittal on one or more charges or might have supported a lesser sentence. *See, e.g., Brady*, 373 U.S. 87; *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). To show that counsel were ineffective, Sanchez must allege facts sufficient to support an inference (1) that counsel's performance fell below an objective standard of reasonableness, *Strickland*, 466 U.S. at 687–88, and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

What counts as "exculpatory" and what is reasonable or unreasonable for counsel to do both depend on the relevant law. "A fundamental principle of criminal law is that a person is held responsible for all consequences *proximately* caused by his criminal conduct." *United States v. Rodriguez*, 766 F.3d 970, 983 (9th Cir. 2014) (quoting *United States v. Guillette*, 547 F.2d 743, 749 (2d Cir. 1976)) (internal brackets omitted) (emphasis added). Proximate cause "incorporates the notion that an accused may be charged with a criminal offense

---

[3] Sanchez refers to a toxicology report and the report of the autopsy. Neither report was introduced at trial. The autopsy report was disclosed. *See* Notice of Expert Witness (Doc. 238) at 2. For present purposes, the Court will assume there was a separate toxicology report, *see* 3 Trial Tr. (Doc. 328) at 430:16–20, that was not disclosed with the autopsy report.

even though his acts were not the immediate cause of the victim's death." *Id.* The causal link between a defendant's conduct and a victim's death might be broken if an alternative cause (such as termination of life support) was, in hindsight, extraordinary or abnormal. *Id.* at 980. But a defendant remains responsible for foreseeable consequences that follow from his acts.

In *Rodriguez*, the victim was a prison inmate, Scopazzi, who was stabbed with a shank four times in his chest and once in his upper arm. He resisted medical treatment. Prison guards put him on the ground, shackled him, and transported him for medical treatment. Although his life could have been saved, his medical care "fell well below well-recognized standards of care," and at some point he removed his breathing tube himself. Even so, the court held that the defendant could foresee there would be a medical response to Scopazzi's injuries, and the medical response might be imperfect. The court said, "[A]ny negligence in the foreseeable [medical] response to the stab wounds does not break the causation chain," and "[t]he same is true regarding Scopazzi's removal of his breathing tube." *Rodriguez*, 766 F.3d at 982. Scopazzi would not have needed the medical care that proved insufficient to save his life were it not for the defendant's and other inmates' stabbing him. Rodriguez's conviction was affirmed. *See also, e.g., United States v. Pineda-Doval*, 614 F.3d 1019, 1028–30 (9th Cir. 2010) (rejecting defendant's argument that Border Patrol agents' mishandling of a spike strip was a

8

superseding cause of the deaths of the illegal aliens he was transporting).

At Sanchez's trial, the forensic pathologist testified:

> [M]ost of [Rides Horse's] injuries that I could identify were externally. Internally, she did have a lot of pl[e]ural adhesions of her lungs. . . . just fibrous adhesions, somewhat like scar tissue, that are on the outside of the lungs that makes the lungs kind of stick to the chest wall. And usually those develop when a person has infection like pneumonia or something like that.
>     And otherwise, I think for the majority of her organs, they were pretty unremarkable. She was fairly young, and so she had generally healthy organs prior to her injuries.
> . . .
>     [S]he had greater than 50 percent of her body that was either covered with second and third degree burns that were in various stages of being skin grafted. So at the hospital they would actually take the good tissue and try and move it over to the sides where the burns are to try and get that to heal.
>     . . . Then she had several areas of burning on her torso, which were much more significant on the back of her body than they were on the front. So she did have some areas of full thickness burns, or third degree burns that were on her breast and abdomen. But her whole back was basically one large area burn which had then been debrided multiple times at the hospital, so it was just basically taking the skin off, and all you're looking at is the tissue that's underneath of it.
>     . . . [S]he got to the point where she was developing so many infections that the graft sites would not heal. And so then basically I'm just looking at tissue that's been grafted but is dead, in addition to all of the burn injuries.
>     Her cause of death was from complications of her thermal burns.

3 Trial Tr. at 428:4–15, 428:24–430:2, 430:24–25.

Due to the nature of this evidence, a toxicology report in Sanchez's case or other analysis of the care she received would be similar to the evidence found

9

irrelevant in *Rodriguez*. Medical professionals' inability to save the victim does not exculpate the person who caused the injuries requiring medical intervention. Even assuming that serious medication or treatment errors occurred, Rides Horse was vulnerable to them because Sanchez and others beat her, strangled her, doused her in gasoline, and set her on fire.

Therefore, Sanchez's allegations do not support an inference that there was a *Brady* violation. *See Brady*, 373 U.S. at 87. Likewise, his allegations do not support an inference that counsel unreasonably failed to challenge the cause of Rides Horse's death. The facts and arguments Sanchez claims they should have developed were not at all likely to help him.

## B. Fifth Amendment Right to Counsel

Sanchez claims that his motion to suppress his statements to BIA law enforcement agents should have been granted. He contends that he did not knowingly and voluntarily waive his *Miranda* rights[4] because he was provided with a lay advocate rather than an attorney. He also claims that the agents who interviewed him interfered with his right to counsel by permitting him to consult with a lay advocate. *See* Mot. § 2255 at 4, 10–11.

The Court of Appeals affirmed denial of the suppression motion. *See* Order (Doc. 104); *see also* Mem. Disp. (Doc. 407) at 2, *Sanchez*, No. 18-30255 (9th Cir.

---

[4] *See Miranda v. Arizona*, 384 U.S. 436, 471–74 (1966).

Mar. 16, 2020). Sanchez acknowledges it did so. He states that this Court should not follow the law of the case because a murder charge is so significant that all of his constitutional rights should be preserved. He also asserts that any diminishment of his constitutional protections would indicate discrimination against his native culture. *See* Mot. § 2255 at 4; *see also, e.g., United States v. Renteria*, 557 F.3d 1003, 1006-07 (9th Cir. 2009); *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997); *see also United States v. Scrivner*, 189 F.3d 825, 828 n.1 (9th Cir. 1999) (noting that "relitigation bar" precludes reconsideration in § 2255 proceeding of claims raised and adjudicated on direct appeal).

But Sanchez's motion to suppress was denied *because* this Court and the appellate court found no violation of his constitutional rights. As he does not state a valid reason to depart from the law of the case, these claims are dismissed.

### C. Content of Sanchez's and Others' Statements

Sanchez contends that counsel should have argued that he "refused to make statements on who actually harmed the victim," whereas the prosecution coerced the co-defendants to change their statements "to fit what the prosecutor had in mind." Mot. § 2255 at 12. He appears to assert that counsel should have advised him to testify. *See id.* at 13.

Each cooperating witness gave a different account than the others. They contradicted not only each other but themselves as well. That was defense

11

counsel's central theme in closing arguments. She told the jury it could not trust what any of them said, because all of them lied at one time or another. All of them changed their stories in ways that protected themselves. And some of them had ample opportunity to coordinate their testimony. *See, e.g.*, 5 Trial Tr. (Doc. 330) at 748:5–753:7, 755:4–759:15, 760:5–16, 761:4–9. This approach was a reasonable strategy.

Sanchez suggests the defense would have been stronger had counsel pointed out that he did not implicate anyone. But, as all the evidence indicated Sanchez was present at the scene of the crime, his failure to implicate anyone else was not probative of anything in particular. It was as consistent with his own guilt as with lack of knowledge about what happened. As for Sanchez's claim that the cooperating witnesses changed their stories at the prosecutor's bidding, their contradiction of each other was not persuasive evidence that the prosecution told them what to say. While they did change the stories under threat of prosecution and punishment, counsel certainly drew attention to that fact, and the jury was well aware of it.

To the extent Sanchez suggests counsel should have advised him to testify, *but see United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir. 1993), any competent defense attorney could reasonably have advised him not to do so. Because Sanchez lied to the BIA agents who questioned him on April 20, 2016, *see, e.g.*,

12

Interview Tr. (Doc. 101-1) at 25:9–25, 30:19–35:14,[5] he could easily be impeached. In addition, he had an expert witness who was going to testify that he had cognitive deficits. *See* 4 Trial Tr. (Doc. 331) at 603:7–640:15. If Sanchez testified well, her testimony might be seriously undermined. And if he performed poorly on the witness stand, he might damage himself in ways she could not correct. Counsel could reasonably have decided, first, that the defense witness's testimony was predictable and added a favorable interpretive layer to Sanchez's video interview, and second, that the interview with expert overlay was preferable to the wild card that Sanchez's trial testimony would present.

Sanchez does not allege facts sufficient to support an inference either that counsel performed unreasonably or that he was unfairly prejudiced as a result. All claims questioning counsels' handling of the pretrial statements and Sanchez's own potential trial testimony are denied.

### IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. §

---

[5] The video recording of the interview was played at trial, *see* 4 Trial Tr. (Doc. 331) at 540:5–542:21, but it is not filed in the Court's record of the case. A transcript of the interview was filed in connection with Sanchez's motion to suppress.

13

2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Sanchez's claims do not meet the relatively low threshold for a certificate of appealability. Rides Horse would not have needed medical treatment or life support were it not for the actions of Sanchez and his friends. Even assuming, solely for the sake of argument, that a toxicology report was not disclosed and indicated serious errors in treatment, the allegation does not support an inference that it exonerated him or would have given counsel a reasonable argument that he did not cause Rides Horse's death. Sanchez cannot litigate his previously unsuccessful suppression motion again, as the appellate court affirmed its denial on direct review. Counsel did not miss any opportunity realistically offered by the witnesses' contradictory statements, and any reasonable counsel could have advised Sanchez not to testify.

Sanchez's mandatory life sentence is the second most serious penalty the law provides. But he does not allege any fact that, if proved true, might lead to a colorable claim of ineffective assistance of counsel or a *Brady* violation. The Court sees no reason to encourage further proceedings. A COA is not warranted.

Accordingly, IT IS ORDERED:

1. Sanchez's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Doc. 427) is DENIED.

2. A certificate of appealability is DENIED. The clerk shall immediately process the appeal if Sanchez files a Notice of Appeal.

3. The Clerk of Court shall ensure that all pending motions in this case and in CV 21-116-BLG-SPW are terminated and shall close the civil file by entering judgment in favor of the United States and against Sanchez.

DATED this 21st day of June, 2022.

Susan P. Watters
United States District Court